UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CASE NO.   2:15-cr-4-FtM-38CM |
| : | |
| TRAVIS RIDDLE : | |

## UNITED STATES' SENTENCING MEMORANDUM

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, files its sentencing memorandum.

### I.    BACKGROUND INFORMATION

On or about May 21, 2014, Les Douanes Françaises (French Customs) located at the Roissy Charles de Gaulle Airport in Paris, France encountered a Dutch Post parcel arriving from the Kingdom of Netherlands (Netherlands), destined for, and addressed to, 10709 Maui Circle, Estero, Florida 33908.   The parcel was labeled as being sent from a company called "Natural Dyes" located at P.O. Box 720 5600AS Eindhoven, The Netherlands, and said to contain "Natural Pigment."   Inside the parcel, French Customs found two plastic bags filled with a dark colored powder which weighed a total of approximately 4.580 kilograms. Preliminary chemical composition testing was conducted by a French Customs laboratory and the powder was found to consist of Dimethyltryptamine, (DMT), a Schedule I narcotic substance.   French Customs then delivered the package to the Department of Homeland Security. The addressee of the

package was listed as Travis Riddle (RIDDLE), of 10709 Maui Circle, Estero, Florida 33908, USA.

On May 30, 2014, HSI Fort Myers conducted a controlled delivery of the package containing approximately 4.5 kilograms of DMT.  Prior to and during the delivery process, active surveillance on RIDDLE was conducted.  The parcel was delivered at approximately 11:00 a.m. to 10709 Maui Circle, Estero, Florida 33928 by an HSI Agent working in a covert capacity. The package was accepted by the occupants of the residence. Subsequently law enforcement encountered the Defendant and another individual in a Jeep Liberty after the Defendant had retrieved the package from the residence.

HSI agents searched the Jeep Liberty, and located inside the vehicle, were several items which appeared to be evidence of narcotics activity.  The following items were located and seized:   the narcotics parcel containing approximately 4.5 kilograms of DMT; a one gallon can of Naphtha; a Samsung Cell phone belonging to RIDDLE; two bags of pickling lime; four, two-gallon buckets, two of which appeared to be used and two appeared to be new; two glass baking plates with a white residue; a digital scale with a sticker of the DMT molecule attached; two glass marijuana pipes; approximately 145 unfilled 450 mg capsules in a bag; miscellaneous baggies in various sizes; a one cup measuring cup; an Ace Hardware shopping receipt signed by RIDDLE and showing a date of May 30, 2014, for the purchase of Naphtha and two, two-gallon buckets; a hand written ingredients list under the heading Q21 tek with "Naphtha, Buckets X 2, Lime

calcium hydro, Vinegar, Cups" listed; a sealed, glass storage jar with a-white residue.   All items used in the manufacturing of DMT.

RIDDLE provided signed consent to search waivers for his cell phone, his vehicle, and his bedroom, located at 6118 Park Road, Fort Myers, Florida 33908. HSI Fort Myers agents preformed searches of RIDDLE's bedroom and vehicle, however no evidence was collected from either location.  Both locales had material utilized in the growing and processing of living organisms, to include mushrooms and plants.  What were described as living cultures were also found in RIDDLE's bedroom, along with literature on how to grow several different legal and illegal substances.  Although some of the items discovered may be used to grow illicit drugs, they also have legitimate purpose and were not seized.

Post-Miranda, RIDDLE made statements to law enforcement.  RIDDLE was shown a picture of the parcel, and a picture of the contents contained within the parcel. HSI agents then explained that the initial laboratory testing by French Customs identified the contents of the parcel as approximately 4.5 kilograms of a powder containing DMT. RIDDLE was questioned about the origin of the parcel, the cost of the DMT, and the method of ordering.  RIDDLE indicated that the parcel was ordered electronically over the internet from a company called "Gaiana," and claimed that the DMT was paid for with cash.  RIDDLE stated that he placed the order 14 days prior to the date of the interview, and that he paid approximately $547.00 US for the package, which included shipping costs.  RIDDLE further explained that the transaction was conducted using the internet capability of his Samsung Cell Phone, found in his possession at the time of his arrest.

RIDDLE claimed that all correspondence were directed to, and routed through his personal email account which he indicated was "239tav@gmail.com." RIDDLE stated that the entire ordering process, including payment request information and parcel tracking information, was sent to, or requested via, the referenced email address. Furthermore, RIDDLE told HSI Fort Myers agents that he accessed the referenced information solely on the Samsung Cell Phone.

During the surveillance of RIDDLE on May 30, 2014, RIDDLE was observed going into an ACE Hardware store and emerging with a purchase. RIDDLE was observed with what appeared to be plastic buckets and other items. RIDDLE was questioned about the shopping trip.  He stated that he purchased 2 gallon buckets and Naphtha from the Ace Hardware store.  RIDDLE was asked what Naphtha was, and he responded that Naphtha is paint thinner.  RIDDLE was then asked what the items were for, and he stated that they were to be mixed with the powder along with hot water, vinegar, and lime, which RIDDLE indicated was "calcium hydroxide."  RIDDLE stated that by mixing approximately 500 grams, or about 3 cups, of powdered Mimosa Hostilis Root Bark (MHRB) (the plant needed to create the DMT) with the above stated ingredients until an "indigo color," and "the right consistency," is achieved, the resulting mixture will give you a substance "to paint with."

RIDDLE stated that using the previously described combination is a procedure used to extract DMT from MHRB.  RIDDLE stated that once the mixing is complete, the Naphtha is added and the newly formed liquid is placed on glass baking plates and then placed in the freezer where, overnight, the liquid forms into the DMT in a smokable form.

4

RIDDLE indicated that the glass baking plates would also be found in the vehicle RIDDLE took to 10709 Maui Circle.  When questioned where the extraction would take place, RIDDLE stated that he would have most likely completed the process at home, covertly due to the residence being shared with his parents.  RIDDLE told HSI agents that he would have covered the plates with aluminum foil prior to placing them in the freezer and informed anyone who asked about the plates that they were pies.

RIDDLE was questioned about how much crystalized DMT would be extracted using the above method.  RIDDLE stated that approximately one (1) percent of the weight of the powder could be expected.  RIDDLE also stated that of the two bags containing approximately 2.25 kilograms each, about eight (8) glass plates worth of DMT would be harvested.  RIDDLE also explained that a dose of DMT for the normal person would be approximately 100 milligrams, but that up to 5 grams could be taken as a single dose.  RIDDLE stated that he had no intention of selling the extracted DMT, but intended on distributing the DMT to others.  RIDDLE claimed that the use of DMT will place the user in a deep sleep-like state and that the user will feel "awakened."  RIDDLE also asked HSI Fort Myers agents if they had ever "dreamt," and if they had ever "had DMT."

On June 6, 2014, Customs and Border Protection's laboratory conducted an analysis of the material that was seized from RIDDLE and concluded that the submitted package contained a combined total of 4,579 grams of a substance containing N, N-Dimethyltryptamine (DMT), a Schedule I controlled substance.

HSI agents conducted a search of email address "239tav@gmail.com," which RIDDLE identified as his email address.  Located within the recovered emails were

several incoming and outgoing communications between 239tav@gmail.com and Gaiana.nl at the email address contact@gaiana.nl. GAIANA is the website RIDDLE stated was the source of the 4.5 kilograms of seized DMT. The emails between RIDDLE and GAIANA reference three separate orders of powdered Mimosa Hostilis (Mimosa Hostilis is a root bark which is pulverized into a powder and then sold to be used in the manufacturing of DMT.) The first order occurred on or about January 5, 2013, for 1 kilogram; the second order occurred on or about November 10, 2013, for 1 kilogram, and the third order occurred on or about May 3, 2014 for 4.5 kilograms.

The other individual explained that he had attended school with RIDDLE and that RIDDLE was a grade higher than the other individual. The other individual explained that RIDDLE introduced him to DMT while he (the other individual) was between his junior and senior years in high school. The other individual graduated high school in 2014. Halfway between the other individual's senior year of High School (approximately at Christmas time) RIDDLE returned from California with DMT. Between Christmas time and the beginning of May, the other individual smoked DMT with RIDDLE six or seven times. Of those six or seven times, three or four of them were at the pavilion located at Cedar Creek Community in Lee County, Florida, the rest were on a nature trail in Cedar Creek.

During the time that RIDDLE distributed DMT to the other individual, the other individual stated that he was present when RIDDLE distributed DMT to him (the other individual) and other individuals that they had known previously, at the Pavilion at Cedar Creek as well as to minors under the age of 18. The pavilion at Cedar Creek is located

within a thousand (1,000) feet of the playground located at Creekside Community Park, in Cedar Creek, Lee County, Florida**.**

II.    **OBJECTIONS TO THE PRE-SENTENCE REPORT (PSR)**

    a.    Fine

Page 1 and Page 15, paragraph 101 list the maximum fine as U.S. $1,000,000.00. 21 USC § 841(b)(1)(C) states that that the fine is U.S. $1,000,000.00; however, since the Defendant pleaded guilty to 21 USC § 860, the Defendant is subject to "a fine up to twice that authorized by section 841(b) of this title may be imposed." Therefore, the Defendant is subject to a fine of $2,000,000.00. unless the Court finds that the "safety valve" is applicable.

    b.    Defendant's Base Offense Level (BOL)

The United States Probation Office (USPO) filed its final PSR (Doc. 77) on February 12, 2016. In the PSR at paragraph 47, the USPO listed the Defendant's BOL as 28. In its calculation, the USPO determined that since the Defendant had imported 7.5 kilograms of the root bark of the Mimosa Hostilis plant. The Mimosa Hostilis Root Bark (MHRB) is the only component in the Dimethltryptamine (DMT) process that contains DMT, a schedule I narcotic drug. Pursuant to the United States Sentencing Guidelines (USSG), the USPO converted the amount seized into marijuana at a rate of 100 grams of marijuana to 1 gram of DMT. A conversion of the 7,500 grams of DMT in this case provides for a marijuana equivalency of 750 kilograms. According to the USSG, at least 700 kilograms but less than 1,000 kilograms of marihuana yields a base offense level of

28. USSG § 2D1.1(c)(6). The United States submits that this calculation is the correct calculation.

From November 2013 and continuing until May 2014, the Defendant imported from the Netherlands, 7.5 kilograms of powder (grounded up) MHRB. At the time of his arrest, the Defendant explained the manner in which he prepared the powder MHRB, which involved an extraction process that would transform the DMT into a crystalized form and render it "smokeable."

The Defendant's main argument as to why the his BOL should only be 12 is because the process that he utilized to make the DMT "smokeable" created a waste product that is not usable. The Defendant bolsters this argument by comparing DMT preparation to illicit methamphetamine synthesis and emphasizing that the USSG § 2D1.1 comment (n.1) excludes waste water from an illicit laboratory from the definition of mixture or substance. Comment (n. 1) also notes that mixture or substance also has the same definition as 21 U.S.C. § 841. This argument fails because it ignores the various methods in which this illegal substance can be consumed.

Under U.S.S.G. § 2D1.1, the offense level is determined based on the amount of drugs involved. U.S.S.G. § 2D1.1(a)(3). The commentary explains that, "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." U.S.S.G. § 2D1.1, "Notes to Drug Quantity Table, Note A."

In *Chapman*, the Supreme Court held that it is proper to include the weight of a cutting agent when determining the total weight of a "mixture or substance containing a

detectable amount" of a particular drug. 500 U.S. at 459-60, 111 S.Ct. 1919 (quoting 21 U.S.C. § 841(b)(1)(A)). The Court acknowledged that "[i]n some cases, the concentration of the drug in the mixture is very low," but nevertheless determined that Congress intended for the entire mixture or substance to be weighed so "long as it contains a detectable amount" of the drug. *Id.* at 459-61, 111 S.Ct. 1919 ("Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence."). In reaching that conclusion, the Court described a "mixture" in these terms:

> A "mixture" is defined to include "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." A "mixture" may also consist of two substances blended together so that the particles of one are diffused among the particles of the other.

*Id.* at 462, 111 S.Ct. 1919 (citation omitted). The Court distinguished a "mixture" from a "container," such as a bottle or a car, from which a drug is easily distinguished and separated. Id. at 462-63, 111 S.Ct. 1919.

Though there lacks a significant amount of jurisprudence specifically regarding the DMT weight calculation, the Supreme Court looked at DMT itself in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal (UDV)*, 546 U.S. 418, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006).

UDV is a religious organization with Brazilian roots whose adherents receive communion by drinking hoasca, a tea brewed from plants unique to the Amazon Rainforest that contains DMT. *Id.* After U.S. Customs inspectors seized a hoasca shipment to the American UDV and threatened prosecution, the UDV filed suit for declaratory and injunctive relief, alleging, *inter alia*, that applying the Controlled Substances Act to the UDV's sacramental hoasca use violates Religious Freedom Restoration Act (RFRA). *Id.* Though ultimately the Supreme Court found that the UDV had the right to seek injunctive relief, they also made other findings that are relevant to the case *sub judice*.

In arguing that UDV should not be allowed injunctive relief at the district level, the government argued that it had an interest in compliance with the 1971 United Nations Convention on Psychotropic Substances, Feb. 21, 1971, [1979–1980] 32 U.S.T. 543, T.I.A.S. No. 9725. The Convention, signed by the United States and implemented by the Controlled Substances Act, calls on signatories to prohibit the use of hallucinogens, including DMT. The government argued that it has a compelling interest in meeting its international obligations by complying with the Convention. *Id. at* 437, 126 S. Ct. 1211, 1224.

The Supreme Court determined that, "the Convention provides that 'a preparation is subject to the same measures of control as the psychotropic substance which it contains,' and defines 'preparation' as 'any solution or mixture, in whatever physical state, containing one or more psychotropic substances.' *See* 32 U.S. T., at 546, Art. 1(f)(i); *id.*, at 551, Art. 3. **Hoasca is a 'solution or mixture' containing DMT**; the fact that it is made

by the simple process of brewing plants in water, as opposed to some more advanced method, does not change that. To the extent the commentary suggests plants themselves are not covered by the Convention, that is of no moment—the UDV seeks to import and use a tea brewed from plants, not the plants themselves, and the tea plainly qualifies as a 'preparation' under the Convention." *Id.* at 438, 126 S. Ct. 1211, 1224-25. (emphasis added).

Though the *UDV* case was civil in nature, there is no denying the similarities. Hoasca is a tea made from the a plant, which the Supreme Court said is a solution or mixture containing DMT, just as in the case *sub judice* the Defendant imported into the United States, the powder root bark from the plant Mimosa Hostilis, which is a mixture containing DMT. In order for the Defendant's argument to prevail, the Defendant would have to ignore Supreme Court jurisprudence opining that Hoasca is a solution or mixture containing a detectible amount of DMT or argue that the powder form of MHRB is not a mixture or substance containing a detectible amount of DMT. The Defendant would also have to ignore the "notes to drug quantity table" (A), "the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." The fact that the Defendant chose to use a "more advanced method" instead of the "simple process of brewing plants in water" did not change the fact that the powder MHRB is a mixture containing a detectable amount of DMT and should be counted in its entirety.

  c.  Objection to Supervised Release Calculation

Page 15, paragraph 96 lists the maximum term of supervised released is five years for Count Four. 21 USC § 841(b)(1)(C) states "that any sentence imposing a term of imprisonment under this paragraph shall…impose a term of supervised release of at least 3 years in addition to such term of imprisonment;" however, since the Defendant pleaded guilty to 21 USC § 860, the Defendant is subject to "at least twice any term of supervised release authorized by section 841(b) of this title for a first offense." Therefore, the Defendant is subject to a term of supervised release of six (6) years, unless the Court finds that the "safety valve" is applicable.

  d.  Objection to Variance

The Court should reject any variance. A variance is a sentence imposed outside the applicable guideline range based upon the statutory sentencing factors found at 18 U.S.C. § 3553(a). As explained by the Ninth Circuit: "A variance occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)." Rangel, 697 F.3d 795 at 801. A "variance" outside the guideline range provided for in the Guidelines Manual should occur after consideration of all relevant departure provisions. *Gall v. United States*, 552 U.S. 38, 48, 128 S. Ct. 586, 596, 169 L. Ed. 2d 445 (2007). Courts have held that variances are not subject to the guideline analysis for departures. *See e.g. United States v. Fumo*, 655 F.3d 288, 317 (3d Cir. 2011). In some situations, a prohibited ground for departure may be a valid basis for a variance. *See e.g. United States v. Chase*, 560 F.3d 828 (8th Cir. 2009) (departure precedents do not bind district

courts with respect to variance decisions, but may be considered "persuasive authority".) Variances are not subject to notice requirements applicable to departures. See *Irizarry v. United States*, 553 U.S. 708, 715–16, 128 S.Ct. 2198, 2203, 171 L.Ed.2d 28 (2008). A court may grant a departure and a variance in the same sentence. See *United States v. Hayes*, 762 F.3d 1300, 1307 (11th Cir. 2014). The substantive reasonableness of a sentence considers the totality of the circumstances. *United States v. Livesay*, 525 F.3d 1081, 1091 (11th Cir.2008). In arriving at a substantively reasonable sentence, the district court must give consideration to the sentencing factors listed in 18 U.S.C. § 3553(a). *United States v. Talley*, 431 F.3d 784, 786 (11th Cir.2005).

Title 18, United States Code, Section 3553(a) states: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed shall consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . ."

Given the facts noted above underlying the instant offense, there can be no doubt that a variance is not warranted in the case *sub judice*. First, the very nature and circumstances of the offense itself demands that a variance not be given. In the case *sub*

*judice*, the Defendant was caught with 4.5 kilograms of MHRB and law enforcement found evidence that the Defendant had imported several kilograms more.

Furthermore, the Defendant did not just transact in DMT, the Defendant also transacted in marijuana and psychedelic mushrooms. During the search of the Defendant's bedroom, law enforcement found what were described by the Defendant as mushroom cultures and other mushroom growing paraphernalia. Text message conversations found subsequent to a search on the Defendant's phone yielded many conversations about psychedelic mushrooms. The conversations found on the Defendant's mobile phone describes a "bulk" and "mass" production mushroom growing operation and references "lc" and "PE's" which, according to open source research and confirmed by witness statements, this means "Liquid Culture" and "Penis Envy" respectively. Liquid Cultures are used in the fast colonization of mushrooms; "Penis Envy" is a term used in place of the scientific term "Psilocybe Cubensis." PE mushrooms, according to open source research, is one of the most popular strains of psychedelic mushrooms grown; one gram of which could cause an intense hallucinogenic experience. In the text message conversation, the Defendant writes that liquid culture was made for "treasure coast" which is a region of Florida on the Atlantic coast, and continues by writing that " 5 very powerful minds" are now "serving the light"; A text message conversation contains contains the text stating that "We are about to change Floriiida" suggests that the participants are aware of the fact that the harvested mushrooms, through the proposed mass cultivation, were likely to be distributed throughout the state of Florida.

The Defendant also had various conversations about marijuana distribution as well.

| Date | Received/Sent | Contents |
|---|---|---|
| 5/8/2014 2:27:55 | Received | Would you be down to make edibles(edible cannabis products) tomorrow I have a place |
| 5/8/2014 15:33:35 | Received | Are you down to make the edibles |
| 5/9/2014 16:15:09 | Received | I can't smoke past 12:47 I have work at 2:30 and my boss will be there |
| 5/11/2014 12:44:58 | Received | Totally came down off the edibles. Still a little high. Totally worth the money. |
| 5/11/2014 23:31:04 | Received | Let's Burn |
| 5/11/2014 23:36:10 | Received | The pavilion |
| 5/14/2014 21:48:06 | Received | Yeah do u have herb |
| 5/23/2014 04:21:35 | Received | Come chill and eat edibles |

| 5/26/2014 20:3106 | Received | Tys mom would like some edibles don't tell anyone Haha dark chocolate |
| --- | --- | --- |
| 5/27/2014 15:22:14 | Received | Edibles? |

This Defendant distributed various illegal substances in addition to the DMT and should not be given a variance.

Second, the court must also consider the history and characteristics of the defendant. Though the Defendant does not have any criminal history, his illegal narcotics distribution has been continuing for several years. The Defendant also distributed narcotics to minors after he turned 18 years of age. The Defendant's criminal lifestyle does not warrant a variance.

Third, the court must consider the need for the sentence imposed.  In considering the need for the sentence imposed the court must look at the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.  Clearly, the facts as outlined above demonstrate the seriousness of the offense in the case at hand.  A variance would not be warranted because the punishment given is necessary to promote respect for the law and to provide just punishment.  The community, as well as the Defendant in particular, must know that narcotic distribution near a protected location and importation yields a severe sentence imposed upon conviction.  To do otherwise would promote a total disregard for the law. Furthermore, the Defendant has availed himself to the "safety valve" pursuant to 18 USC § 3553 and

USSC § 5C1.2, and assuming that the Court agrees that he is deserving of it, it will have his guideline calculations reduced.

Fourth, the court must consider the need to afford adequate deterrence to criminal conduct. This factor encompasses not only the specific deterrence for future criminal conduct on the part of the Defendant, but also to the general deterrence for the general public. Clearly, a significant sentence of imprisonment would ensure the deterrence to this specific defendant as he will be punished during that time frame. Of equal importance, if not of greater importance, is the need to deter the general public from engaging in similar conduct in the future. The community at large must know that if you engage in narcotic distribution near a protected location and importation of narcotics, you will be punished.

Lastly, the court must consider the need to protect the public from further crimes of the Defendant, this is important especially since the Defendant believes that these substances are beneficial to people and he asked for asylum from the government of Ecuador due to his prosecution in the United States. As noted above, clearly, a significant sentence would ensure the deterrence.

**I.     Conclusion**

For the reasons set forth above, the government requests that this Honorable Court should find the Defendant base offense level to be a 28 and not to grant him a variance.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney

By:     *s/ Michael C. Baggé-Hernández*
        MICHAEL C. BAGGÉ-HERNÁNDEZ
        Assistant United States Attorney
        Florida Bar No. 0051923
        2110 First Street, Suite 3-137
        Fort Myers, Florida 33901
        Phone:   (239) 461-2200
        Fax:   (239) 461-2219

U.S. v. TRAVIS RIDDLE                                            Case No. 2:15-cr-4-FtM-38CM

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 17, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

>Russell K. Rosenthal
>russ_rosenthal@fd.org

*s/ Michael C. Baggé-Hernández*
MICHAEL C. BAGGÉ-HERNÁNDEZ
Assistant United States Attorney
Florida Bar No. 0051923
2110 First Street, Suite 3-137
Fort Myers, Florida   33901
Phone:  (239) 461-2200
Fax:  (239) 461-2219
Email: michael.c.bagge@usdoj.gov